PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

      *Plaintiff-Appellee,*

v.

BENJAMIN TOD CARTER,

      *Defendant-Appellant.*

No. 09-5074

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Joseph R. Goodwin, Chief District Judge.
(2:09-cr-00055-1)

Argued: October 26, 2011

Decided: January 23, 2012

Before NIEMEYER and DIAZ, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Vacated and remanded by published opinion. Judge Niemeyer
wrote the opinion, in which Judge Diaz and Senior Judge
Hamilton joined.

## COUNSEL

**ARGUED:** Lex A. Coleman, OFFICE OF THE FEDERAL
PUBLIC DEFENDER, Charleston, West Virginia, for Appel-
lant. Anthony William Vitarelli, UNITED STATES

DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Mary Lou Newberger, Federal Public Defender, Jonathan D. Byrne, Appellate Counsel, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant. R. Booth Goodwin, II, United States Attorney, Charleston, West Virginia, Lisa G. Johnston, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Huntington, West Virginia, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

Following a police search that uncovered marijuana and firearms in Benjamin Carter's West Virginia apartment, Carter conditionally pleaded guilty to possessing a firearm while being an unlawful user of marijuana, in violation of 18 U.S.C. § 922(g)(3). At the time of his arrest, Carter was using marijuana and conceded that he had been using it for approximately 15 years. Carter's conditional guilty plea reserved for appeal the question of whether his § 922(g)(3) conviction violates his Second Amendment right to keep and bear arms.

Although we conclude, applying the intermediate scrutiny standard, that Congress had an important objective for enacting § 922(g)(3) to reduce gun violence and *might* have reasonably served that objective by disarming drug users and addicts, we nonetheless find that the government failed to make the record to substantiate the fit between its objective and the means of serving that objective. Therefore, we vacate the judgment and remand for further proceedings.

I

Responding to complaints of suspected drug activity at 735 Central Avenue, Charleston, West Virginia, a two-unit apart-

ment building where Carter was living at the time, Charleston police investigated by knocking on doors and talking with persons who answered. After finding evidence of marijuana use in the first unit, the officers proceeded to knock on Carter's door. Carter answered and allowed the officers to enter his apartment. Upon smelling marijuana, the officers questioned Carter, who acknowledged that he had been smoking marijuana and indeed that he had been using the drug for 15 years. The officers recovered from the apartment 12 grams of loose marijuana, 15 grams of partially smoked blunts, a digital scale, $1,000 in larger bills, and $122 in smaller denominations. Carter also informed the officers about two firearms in his closet—a semi-automatic pistol and a revolver—and disclosed that he had purchased the weapons from a friend a week earlier for his defense. He later explained in more detail that he had purchased the guns because he lived in "a bad neighborhood" and needed weapons to protect himself and his nephew, who also lived with him in the apartment. Indeed, at sentencing, Carter's attorney represented to the court that one month after Carter's arrest in this case, the other unit in the apartment building was burglarized, and his neighbor was shot eight times.

After being indicted for violating 18 U.S.C. § 922(g)(3), which prohibits firearm possession by a person "who is an unlawful user of or addicted to any controlled substance," Carter filed a motion to dismiss the indictment, arguing, among other things, that § 922(g)(3) was unconstitutional, facially and as applied to him. The district court denied the motion, reasoning that § 922(g)(3) "is far less restrictive than the laws held unconstitutional in [*District of Columbia v. Heller*, 554 U.S. 570 (2008)] and is consistent with the safety based exceptions recognized in that case." Carter then entered a conditional guilty plea, reserving his right to appeal the district court's denial of his motion to dismiss, and the district court sentenced Carter to three years' probation. He now appeals, raising as his only issue the constitutionality of his conviction under 18 U.S.C. § 922(g)(3).

## II

Carter contends that § 922(g)(3) unjustifiably burdens his Second Amendment rights. Acknowledging that he is a user of marijuana, he contends that he was nonetheless entitled, under the Second Amendment, to purchase the guns for the lawful purpose of protecting himself and his nephew in his home against those who might intrude. And because the right of self-defense in the home is the "*central component*" of the Second Amendment protection, *Heller*, 554 U.S. at 599, and is "fundamental" and "necessary to our system of ordered liberty," *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3042 (2010), Carter urges us to employ strict scrutiny in reviewing his claim that § 922(g)(3) infringes on his Second Amendment rights.

When strict scrutiny is employed, Carter argues, § 922(g)(3) cannot survive. He agrees that the prevention of gun-related crime is a compelling government interest, but he insists that the statute is not narrowly tailored to advance that purpose. Rather, he maintains, § 922(g)(3) is over-inclusive in that it categorically disarms all unlawful drug users, some of whom do not pose a realistic threat of gun violence, and under-inclusive because it targets only those who use "a particular class of intoxicants" while excluding users of other intoxicants, such as alcohol, who present a comparable risk of gun violence.

In addition, Carter criticizes the statute's historical pedigree, noting that § 922(g)(3) "is not a long-standing prohibition, similar to those on the possession of firearms by felons or the mentally ill."

Finally, as a fallback position, Carter contends that even if strict scrutiny does not apply, § 922(g)(3) nonetheless fails to pass muster under the intermediate scrutiny standard.

The government contends that the Second Amendment is not at all implicated here because unlawful drug users deserve

no Second Amendment protection whatsoever. It notes that the historical scope of the Second Amendment right to keep and bear arms extended only to "law-abiding and responsible" citizens who were "capable of exercising it in a virtuous manner." Alternatively, the government contends that insofar as Carter may be entitled to invoke the Second Amendment, any review of the statute's application to him must be conducted under the intermediate scrutiny standard. Under that standard, the government maintains, the statute is constitutional because it reflects Congress' well-founded empirical judgment that gun ownership by illegal drug users "pose[s] a risk to society."

Any Second Amendment analysis must now begin with the Supreme Court's recent seminal decision in *Heller*, which held that the Second Amendment codified a "*pre-existing*" right that allows individuals to keep and bear arms. *Heller*, 554 U.S. at 592, 595. The Court noted that the right to keep and bear arms was understood by the founding generation to encompass not only militia service, but also "self-defense and hunting," *id.* at 599, and that, indeed, self-defense constituted "the *central component* of the right," *id.* Moreover, the Court observed, the right to self-defense is at its zenith within the home "where the need for defense of self, family, and property is most acute." *Id.* at 628. The Court did not decide whether, or to what extent, the Second Amendment protects a right to self-defense outside of the home. *See United States v. Masciandaro*, 638 F.3d 458, 467 (4th Cir. 2011) (noting that "a considerable degree of uncertainty remains as to the scope of that right beyond the home").

The weight of the right to keep and bear arms depends not only on the purpose for which it is exercised but also on relevant characteristics of the person invoking the right. *See Heller*, 554 U.S. at 635 ("[W]hatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of *law-abiding, responsible citizens* to use arms in defense of hearth and home" (emphasis

added)); *id.* at 625 ("[T]he Second Amendment does not protect those weapons not typically *possessed by law-abiding citizens* for lawful purposes" (emphasis added)). Placed in the wrong hands, firearms present a grave threat to public safety, and for this reason, the Anglo-American right to bear arms has always recognized and accommodated limitations for persons perceived to be dangerous.

Accordingly, as the *Heller* Court acknowledged, the Second Amendment right, like other constitutional rights, is "not unlimited" in that it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. Indeed, *Heller* lists several examples of what the Court deemed to be "presumptively lawful regulatory measures," including prohibitions on carrying concealed weapons; "longstanding prohibitions" on the possession of firearms by felons and the mentally disabled; laws forbidding firearms "in sensitive places such as schools and government buildings"; laws imposing "conditions and qualifications on the commercial sale of arms"; and restrictions on "dangerous and unusual weapons." *Id.* at 626-27 & n.26. The Court did not, however, explain why the listed restrictions qualify as "presumptively lawful regulatory measures," nor did it provide a methodology by which non-listed laws might be constitutionally assessed. *Id.* at 627 n.26, 635.

In *Heller*, the Court applied these principles and invalidated the District of Columbia's handgun ban, explaining that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster." *Id.* at 628-29 (footnote, citation, and internal quotation marks omitted). The Court did not say which form of scrutiny should apply, but it did rule out rational basis scrutiny, which would be "redundant with the separate constitutional prohibitions on irrational laws," thereby depriving the

Second Amendment of any independent effect. *Id.* at 628 n.27.

We first applied *Heller* in *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), where we adopted—as had been adopted by two other circuits, *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), and *United States v. Skoien*, 587 F.3d 803 (7th Cir. 2009), *rev'd* 614 F.3d 638 (7th Cir. 2010) (en banc)—a two-step approach for evaluating a statute under the Second Amendment. *First*, we inquire whether the statute in question "imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." 628 F.3d at 680. And *second*, if the statute burdens such protected conduct, we apply "an appropriate form of means-end scrutiny." *Id.* Following this approach, we now proceed to evaluate Carter's constitutional challenge to § 922(g)(3).

Under the first step, we have three times deferred reaching any conclusion about the scope of the Second Amendment's protection. In *Chester*, the government did not attempt to argue that domestic violence misdemeanants, who were prohibited by § 922(g)(9) from possessing a firearm, categorically fell outside the historical scope of the Second Amendment. Accordingly, we assumed, *without deciding*, that the misdemeanants there were entitled to some measure of constitutional protection and proceeded to the second step of applying an appropriate form of means-end scrutiny. *See Chester*, 628 F.3d at 680-82. In *Masciandaro*, the government did argue that possession of firearms in a national park should receive no Second Amendment protection whatsoever. *See Masciandaro*, 638 F.3d at 471. Nonetheless, we again did not decide the question because even if the defendant there had rights protected by the Second Amendment, the government would prevail under the intermediate scrutiny test that we applied. *See id.* at 473. And most recently in *United States v.*

*Staten*, ___ F.3d ___, 2011 WL 6016976 (4th Cir. Dec. 5, 2011), we assumed but did not decide that the defendant had rights under the Second Amendment and rejected his constitutional challenge under the second step, applying intermediate scrutiny. *Id.* at *5.

In this case, as in *Masciandaro*, the government contends that dangerous and non-law-abiding citizens are categorically excluded from the historical scope of the Anglo-American right to bear arms. But again we will *assume* that Carter's circumstances implicate the Second Amendment because all courts that have addressed the constitutionality of § 922(g)(3) have upheld the statute, *see, e.g.*, *United States v. Dugan*, 657 F.3d 998 (9th Cir. 2011); *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) (per curiam); *United States v. Seay*, 620 F.3d 919 (8th Cir. 2010); *United States v. Patterson*, 431 F.3d 832 (5th Cir. 2005); *United States v. Richard*, 350 F. App'x 252 (10th Cir. 2009), and our remand in this case is to afford the government the opportunity to substantiate the record and Carter the opportunity to respond. If we ultimately conclude that step two cannot be satisfied, we will need to address the government's argument under step one.

Because Carter asserts that he is protected by the Second Amendment's core right, having purchased his guns for self-defense in the home, he contends his claim must be evaluated under the strict scrutiny standard. While we have noted that the application of strict scrutiny is important to protect the core right of self-defense identified in *Heller*, *see Masciandaro*, 638 F.3d at 471, that core right is only enjoyed, as *Heller* made clear, by "law-abiding, responsible citizens," *Heller*, 554 U.S. at 635. But Carter cannot claim to be a law-abiding citizen, and therefore his asserted Second Amendment right cannot be a core right, as we held in *Chester*, where we concluded that the defendant's status as a domestic violence misdemeanant rendered his claim "not within the core right identified in *Heller*." *Chester*, 628 F.3d at 682-83. Accord-

ingly, as we did in *Chester*, we will apply intermediate scrutiny in evaluating Carter's claim. *Id.* at 683.

In reaching this conclusion, we join the other courts of appeals that have rejected the application of strict scrutiny in reviewing the enforcement of § 922(g)(3), or, for that matter, any other subsection of § 922(g). *See Dugan*, 657 F.3d at 999; *Yancey*, 621 F.3d at 683; *Seay*, 620 F.3d at 925; *Patterson*, 431 F.3d at 835-36; *Richard*, 350 F. App'x at 260.

Under intermediate scrutiny, the question becomes whether there is "a 'reasonable fit' between the challenged regulation and a 'substantial' government objective." *Chester*, 628 F.3d at 683 (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)); *Marzzarella*, 614 F.3d at 98 (requiring an asserted governmental "end" to be either "significant, substantial, or important" and the fit between the statute and the government's end to be "reasonable, not perfect" (internal quotation marks omitted)). Thus, the government bears the burden of demonstrating (1) that it has an important governmental "end" or "interest" and (2) that the end or interest is substantially served by enforcement of the regulation. *Chester*, 628 F.3d at 683; *Masciandaro*, 638 F.3d at 473.

We readily conclude in this case that the government's interest in "protecting the community from crime" by keeping guns out of the hands of dangerous persons is an important governmental interest. *Schall v. Martin*, 467 U.S. 253, 264 (1984); *see also United States v. Salerno*, 481 U.S. 739, 747 (1987) ("There is no doubt that preventing danger to the community is a legitimate regulatory goal"); *Masciandaro*, 638 F.3d at 473 ("Although the government's interest need not be 'compelling' under intermediate scrutiny, cases have sometimes described the government's interest in public safety in that fashion"). Carter concedes this much. But he argues that § 922(g)(3), as applied to him, does not substantially further that interest without excessively intruding on Second Amend-

ment rights. In other words, Carter challenges the link between marijuana usage and gun violence.

Congress enacted the precursor to what is now 18 U.S.C. § 922(g)(3) as part of the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, seeking "broadly to keep firearms away from the persons [it] classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976); *see also Huddleston v. United States*, 415 U.S. 814, 824 (1974) ("The principal purpose of the federal gun control legislation . . . was to [curb] crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency'" (quoting S. Rep. No. 90-1501, at 22 (1968)). Congress effected this purpose, in part, by prohibiting several classes of persons from receiving firearms shipped in interstate commerce, including drug users. While the statute swept in users of several different categories of drugs, marijuana was the only drug specifically listed by name. *See* 82 Stat. 1213, 1220-21 (prohibiting receipt of firearms by any person who is "an unlawful user of or addicted to marihuana or any depressant or stimulant drug . . . or narcotic drug").

This 1968 enactment, however, contained a number of loopholes. It only criminalized the receipt—not the possession—of firearms by such persons, and it did not include "hallucinogenic drugs that were controlled by the Controlled Substances Act, including the violence-inducing drug phencyclidine (PCP), various tranquilizers, designer drugs and other substances that have been added to the schedules of controlled substances." H.R. Rep. 99-495, at 23, 1986 U.S.C.C.A.N. 1327, 1349. Congress closed these loopholes in 1986 with the enactment of the Firearm Owners' Protection Act, Pub. L. 99-308, 100 Stat. 449, 452, which is currently codified at 18 U.S.C. § 922(g)(3) and provides:

> It shall be unlawful for any person . . . who is an unlawful user of or addicted to any controlled sub-

stance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)) . . . to . . . possess in or affecting commerce, any firearm or ammunition.

To discharge its burden of establishing a reasonable fit between the important goal of reducing gun violence and the prohibition in § 922(g)(3), the government may not rely upon mere "anecdote and supposition." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822 (2000). Indeed, in *Chester*, we remanded the case to the district court for further development of the record because the government attempted to justify the permanent disarmament of domestic violence misdemeanants with unsupported intuitions rather than tangible evidence. *See Chester*, 628 F.3d at 683. Nonetheless, the Constitution does not mandate a specific method by which the government must satisfy its burden under heightened judicial scrutiny. *See, e.g.*, *Satellite Broadcasting & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 355, 360 (4th Cir. 2001) (requiring minimal empirical evidence where intermediate scrutiny applied and Congress' justifications were "both familiar and plausible"). On the contrary, the nature and quantity of any showing required by the government "to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000). Even when applying strict scrutiny—requiring a more taxing proof threshold than the one we apply here—the government may, in appropriate circumstances, carry its burden by relying "solely on history, consensus, and 'simple common sense.'" *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (quoting *Burson v. Freeman*, 504 U.S. 191, 211 (1992)). Thus, while the government must carry its burden to establish the fit between a regulation and a governmental interest, it may resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require. *See Staten*, ___ F.3d at ___, 2011 WL 6016976, at *5, *11.

In developing its record in this case, the government has chosen not to rely on academic research or other empirical data to demonstrate the connection between drug use and gun violence, even though such evidence is abundantly available. *See Yancey*, 621 F.3d at 686. To be sure, the record need not be as fulsome as that necessary to justify § 922(g)(9), which was the subject of *Chester*, because the statutory text of § 922(g)(3) contains an important limiting principle that is absent from § 922(g)(9), as well as from many of the other § 922(g) provisions. Section 922(g)(9) permanently disarms anyone convicted of a misdemeanor crime of domestic violence, even if the defendant has only one remote conviction. Although we ultimately upheld § 922(g)(9) as constitutional in *Staten*, *Chester* understandably required the government to make a heightened evidentiary showing before upholding the measure. By contrast, § 922(g)(3) does not permanently disarm all persons who, at any point in their lives, were unlawful drug users or addicts. Instead, it only applies to persons who are *currently* unlawful users or addicts. This feature of § 922(g)(3) contributes to its proportionality for two reasons.

First, the limited temporal reach of § 922(g)(3) necessarily means that it is less intrusive than other statutes that impose a permanent prohibition on the possession of firearms. By initially disarming unlawful drug users and addicts while subsequently restoring their rights when they cease abusing drugs, Congress tailored the prohibition to cover only the time period during which it deemed such persons to be dangerous. *See Dugan*, 657 F.3d at 999.

Second and in a similar vein, application of § 922(g)(3) tracks the ongoing choices of individuals either to remain drug users or to quit drug abuse. We readily acknowledge that for many drug users, breaking the addiction can be an extraordinarily difficult process. Nonetheless, it is significant that § 922(g)(3) enables a drug user who places a high value on the right to bear arms to regain that right by parting ways with illicit drug use. *See Yancey*, 621 F.3d at 686-87. Given that

the Supreme Court has already signaled that the permanent and virtually irreversible prohibition on firearm possession by convicted felons is "presumptively lawful," *Heller*, 554 U.S. at 626-27 & n.26, we might find it challenging to conclude that the narrower classification set forth in § 922(g)(3) is unlawful.

Nonetheless, the government still bears the burden of showing that § 922(g)(3)'s limited imposition on Second Amendment rights proportionately advances the goal of preventing gun violence. And we conclude that in this case, the record it made is insufficient. Without pointing to any study, empirical data, or legislative findings, it merely argued to the district court that the fit was a matter of common sense. In view of our decisions in *Chester* and *Staten*, we therefore remand this issue to the district court to allow the government to develop a record sufficient to justify its argument that drug users and addicts possessing firearms are sufficiently dangerous to require disarming them.

This burden should not be difficult to satisfy in this case, as the government has already asserted in argument several risks of danger from mixing drugs and guns. For example, it claimed that due to the illegal nature of their activities, drug users and addicts would be more likely than other citizens to have hostile run-ins with law enforcement officers, which would threaten the safety of the law enforcement officers when guns are involved. It claimed that because drug users and addicts would "necessarily interact with a criminal element when obtaining their drugs," their transactions in the black market would present far greater risks of violence (including gun violence) than lawful commerce. While the government did not specifically list the risks, it might be able to show, as found by other courts, that the risks arise from drug dealers seeking to maintain distribution territories and networks, protecting their drugs from theft, enforcing payment, and protecting themselves in a market with unrestrained participants. The government also claimed that the inflated

price of illegal drugs on the black market could drive many addicts into financial desperation, with the common result that the addict would be "forced to obtain the wherewithal with which to purchase drugs through criminal acts either against the person or property of another or through acts of vice such as prostitution or sale of narcotics." Finally, it observed that users of illicit drugs "impair their mental function . . . and thus subject others (and themselves) to irrational and unpredictable behavior," arguing that persons who routinely subject themselves to the erratic and irrational effects of mind-altering drugs cannot be entrusted with the responsible use of firearms.

While these arguments are indeed plausible, the government presented no empirical evidence or data to substantiate them. We do note, however, that the Seventh Circuit, in the course of upholding § 922(g)(3) against a similar constitutional challenge, identified a number of studies demonstrating "the connection between chronic drug abuse and violent crime" and "the nexus between Congress's attempt to keep firearms away from habitual drug abusers and its goal of reducing violent crime." *See Yancey*, 621 F.3d at 686.*

Carter argues that even if these risks of mixing drugs and guns are substantiated, few would apply to him because he is *only a user* (and an admitted addict), not a dealer, of mari-

---

*Some of the studies identified in *Yancey* include: Carrie B. Oser, et al., *The Drugs-Violence Nexus Among Rural Felony Probationers*, 24 J. Interpersonal Violence 1285, 1298-99 (2009) (documenting the causal relationship between illegal stimulant use, economic desperation, and violence); Bureau of Justice Statistics, U.S. Dep't of Justice, *Drug Use and Dependence, State and Federal Prisoners, 2004*, at 7 (2007), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/dudsfp04.pdf (finding that nearly half of violent offenders in state and federal prison were drug-dependent); Lana Harrison & Joseph Gfroerer, *The Intersection of Drug Use and Criminal Behavior: Results from the National Household Survey on Drug Abuse*, 38 Crime & Delinquency 422, 438 (1992) (finding that drug abusers are more likely to engage in criminal violence).

juana. But users such as Carter would not be immune from the deleterious effects of using illicit drugs that the government might be able to substantiate, such as the loss of self-control, which threaten the safety of others. Nor would users and addicts be freed from the need to deal with sellers of drugs and to enter black markets in doing so. Participating in such markets, along with heightened financial costs, might be shown to drive many users to a life of crime, including drug dealing. Indeed, it is not clear that Carter himself, a professed user only, did not already succumb to these dynamics of drug using and dealing. At the time of his arrest, officers found in his home a digital scale, $1,000 in large bills accompanying the drugs in his bedroom, firearms, and over $120 in smaller denominations, all of which suggest distribution activity. *See, e.g.*, *United States v. Williams*, 548 F.3d 311, 316 (4th Cir. 2008) (observing that digital scales are "commonly used in drug distribution"); *United States v. Fisher*, 912 F.2d 728, 729, 731 (4th Cir. 1990) (finding that "[t]he large amount of cash [$1,655.42] found in [the defendant's] possession and his ownership of handguns is additional circumstantial evidence of his involvement in narcotics distribution").

Carter also argues that § 922(g)(3) is unconstitutionally overbroad because it generally disarms all illicit drug users without requiring an individualized determination that a particular drug user poses a genuine threat to public safety. But, as the Supreme Court made clear when it signaled that the prohibitions on firearms by felons and the mentally disabled were presumptively constitutional, "some categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc). While § 922(g)(3) does indeed extend to all "unlawful users" of controlled substances, not just distributors, Congress could just as well be apprehensive about gun ownership by users and addicts of illegal drugs as a class.

Finally, Carter faults § 922(g)(3) for its under-inclusiveness by targeting irresponsible users of some mind altering substances, such as marijuana, but not users of other substances, such as alcohol. But this argument simply amounts to a disagreement with Congress' policy decision to link the firearms prohibition in § 922(g)(3) to the Controlled Substances Act, 21 U.S.C. § 802. The Controlled Substances Act is a "comprehensive framework for regulating the production, distribution, and possession of five classes of 'controlled substances.'" *Gonzales v. Raich*, 545 U.S. 1, 24 (2005). In enacting § 922(g)(3), Congress could have chosen to reexamine the foundations of national drug policy and to identify precisely what kinds of drug users ought to be prohibited from possessing firearms. Instead, it opted, quite reasonably, to connect § 922(g)(3)'s prohibition to the carefully studied and regularly updated list of substances contained in the Controlled Substances Act.

At bottom, we conclude that Congress had an important objective for enacting § 922(g)(3) to reduce gun violence and that disarming drug users and addicts might reasonably serve that objective. But the burden of demonstrating the fit rests on the government. Because the government did not present sufficient evidence to substantiate the fit, we vacate the judgment and remand the case to allow it to do so and to allow Carter to respond.

*VACATED AND REMANDED*