**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-5045**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BENJAMIN TOD CARTER,

Defendant - Appellant.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  John T. Copenhaver, Jr., District Judge.  (2:09-cr-00055-1)

Argued: March 20, 2014                Decided: April 30, 2014

Before NIEMEYER and DIAZ, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Diaz and Senior Judge Hamilton joined.

**ARGUED:**  Lex A. Coleman, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant.  Philip Henry Wright, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.  **ON BRIEF:**  Mary Lou Newberger, Federal Public Defender, Jonathan D. Byrne, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, West Virginia, for Appellant.  R. Booth Goodwin, II, United States Attorney, Joshua C. Hanks, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

NIEMEYER, Circuit Judge:

Following his conviction and sentencing for possessing two firearms while being an unlawful user of and addicted to a controlled substance (marijuana), in violation of 18 U.S.C. § 922(g)(3), Benjamin Carter appealed, contending that § 922(g)(3) infringed on his right to bear arms, in violation of the Second Amendment. We vacated the judgment and remanded the case to the district court to allow the government to substantiate the fit between § 922(g)(3) and the government's important interest in protecting the community from gun violence. See United States v. Carter ("Carter I"), 669 F.3d 411 (4th Cir. 2012). After taking evidence from both sides, the district court held that the government had carried its burden in justifying the regulation of guns under § 922(g)(3), and Carter filed this second appeal.

Because we agree with the district court that the government adequately demonstrated a reasonable fit between its important interest in protecting the community from gun violence and § 922(g)(3), which disarms unlawful drug users and addicts, we now affirm.

I

In Carter I, we recited the facts:

Responding to complaints of suspected drug activity at 735 Central Avenue, Charleston, West Virginia, a two-

2

unit apartment building where Carter was living at the time, Charleston police investigated by knocking on doors and talking with persons who answered. After finding evidence of marijuana use in the first unit, the officers proceeded to knock on Carter's door. Carter answered and allowed the officers to enter his apartment. Upon smelling marijuana, the officers questioned Carter, who acknowledged that he had been smoking marijuana and indeed that he had been using the drug for 15 years. The officers recovered from the apartment 12 grams of loose marijuana, 15 grams of partially smoked blunts, a digital scale, $1,000 in larger bills, and $122 in smaller denominations. Carter also informed the officers about two firearms in his closet -- a semi-automatic pistol and a revolver -- and disclosed that he had purchased the weapons from a friend a week earlier for his defense. He later explained in more detail that he had purchased the guns because he lived in "a bad neighborhood" and needed weapons to protect himself and his nephew, who also lived with him in the apartment. Indeed, at sentencing, Carter's attorney represented to the court that one month after Carter's arrest in this case, the other unit in the apartment building was burglarized, and his neighbor was shot eight times.

Carter I, 669 F.3d at 413.

After Carter was indicted for violating 18 U.S.C. § 922(g)(3), he filed a motion to dismiss the indictment, arguing that the statute violated his Second Amendment rights. When the district court denied his motion, Carter entered a conditional guilty plea that preserved his right to appeal the court's ruling on the motion. After accepting Carter's guilty plea, the court sentenced Carter to three years' probation.

On appeal, we vacated the judgment and remanded the case to the district court for further consideration of Carter's Second

3

Amendment challenge. We assumed that Carter's circumstances implicated the Second Amendment but held that, because he could not claim to be a law-abiding citizen, any infringement of his right to bear arms would not have implicated a "core" Second Amendment right. Carter I, 669 F.3d at 416; see also District of Columbia v. Heller, 554 U.S. 570, 635 (2008). We therefore applied intermediate scrutiny to review Carter's challenge. Carter I, 669 F.3d at 417. Under intermediate scrutiny, the question thus became whether there was "a reasonable fit" between § 922(g)(3) and "a substantial [or important] government objective." Id. (quoting United States v. Chester, 628 F.3d 673, 683 (4th Cir. 2010)) (internal quotation marks omitted).

We readily concluded that the government had advanced an important governmental interest in protecting the community from crime and, in particular, from gun violence. Carter I, 669 F.3d at 417. On whether disarming drug users and addicts through § 922(g)(3) reasonably served that interest -- whether there was "a reasonable fit between the important goal of reducing gun violence and the prohibition in § 922(g)(3)" -- we noted that the government could "resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require[d]." Id. at 418. We found that while the government had made plausible commonsense arguments about the risks of mixing drugs and guns,

4

it had "presented no empirical evidence or data to substantiate them." Id. at 419-20. Therefore, in light of Chester and United States v. Staten, 666 F.3d 154 (4th Cir. 2011), we remanded the case to the district court to "allow the government to develop a record sufficient to justify its argument that drug users and addicts possessing firearms are sufficiently dangerous to require disarming them." Carter I, 669 F.3d at 419.

On remand, both the government and Carter submitted a number of publications and studies to the district court about the behavioral tendencies of drug users. After considering the evidence, the court concluded that the government had carried its burden, finding that the data indicated "a correlation between violent crime . . . and drug use." While the court acknowledged that the government's studies did not prove "a strict causal nexus" between drug usage and violence, it found that "the two factors frequently coincide." In addition, it pointed to "common-sense notions" that supported the fit between drug users and violence, noting (1) that drug users are more likely to encounter law enforcement; (2) that their criminal associations increase the risk of violence; (3) that the high price of drugs is likely to lead to violent property crimes; and (4) that drug use impairs judgment. The court then concluded:

> Based upon the narrowed design of the statute, the empirical and scholarly evidence relied upon, the weight of precedent nationwide, and common sense, the

5

United States has shouldered its burden of establishing that section 922(g)(3) is reasonably fitted to achieve the substantial governmental objective of protecting the community from crime by keeping guns out of the hands of those impaired by their use of controlled substances. The court, accordingly, concludes that section 922(g)(3) is constitutional as applied to Mr. Carter.

From the district court's judgment on remand, Carter filed this second appeal.

II

Carter contends that, on remand, the government still failed to prove that a regulation disarming drug users reasonably serves the important governmental interest of protecting the community from gun violence.[1]

The government was required to show that the fit between § 922(g)(3) and the government's important goal is "reasonable, not perfect." Carter I, 669 F.3d at 417 (quoting United States v. Marzzarella, 614 F.3d 85, 98 (3d Cir. 2010)). It was not required to prove that "the regulation is the 'least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in

---

[1] Carter also presents arguments in his brief that we previously resolved in Carter I, presumably to preserve them for further review. He again argues that we should employ strict scrutiny in reviewing his claim that § 922(g)(3) infringes on his Second Amendment rights; that § 922(g)(3) is overly broad; and that § 922(g)(3) is underinclusive. Because we disposed of these issues in Carter I, we discuss them no further in this opinion. See Carter I, 669 F.3d at 416-17, 420-21.

6

question.'" Staten, 666 F.3d at 159 (quoting United States v. Masciandaro, 638 F.3d 458, 474 (4th Cir. 2011)). Moreover, its burden in this case was lower than in other § 922(g) Second Amendment cases because of § 922(g)(3)'s "limited temporal reach" -- i.e., the fact that § 922(g)(3)'s prohibition lasts only as long as the individual remains an unlawful drug user or addict. Carter I, 669 F.3d at 419.

Carter argues that the district court, in concluding that the government carried its burden, erred in two respects: (1) it improperly relied on factors other than empirical evidence in evaluating the soundness of § 922(g)(3); and (2) it failed to recognize that the studies submitted by the government were inadequate because they related to drug use generally rather than marijuana use specifically and they failed to prove a causal link between marijuana use and violence. He maintains that the studies he submitted demonstrate that, in fact, "marijuana users are not prone to violent behavior." (Emphasis added). We address these points seriatim.

A

On the scope of the district court's consideration on remand, Carter contends that the court improperly relied on factors other than empirical evidence in evaluating the validity of § 922(g)(3). He asserts that in Carter I, we rejected the

7

government's use of non-evidentiary support, such as its reliance on common sense, and that therefore the court was required to consider only evidence "presented in the crucible of an adversary proceeding." While he acknowledges that the district court did in fact receive empirical studies into evidence, he notes that its determination "included a heavy reliance on other factors," such as the "design of the statute," the "weight of precedent nationwide," and "common sense." Without these other factors, he argues, the government's showing was insufficient.

Carter's argument misreads our prior opinion in this case. In Carter I, we held that, in establishing the "fit between a regulation and a governmental interest," the government "may resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense." Carter I, 669 F.3d at 418 (emphasis added). While it is true that we found the government's commonsense arguments, standing alone, insufficient to justify § 922(g)(3), that did not imply that legislative text and history, case law, and common sense could play no role in justifying Congress's enactment. To the contrary, we noted that the government's commonsense arguments in this case were plausible and therefore supported § 922(g)(3)'s constitutionality, observing that the government's remaining burden "should not be difficult to satisfy." Id. at

8

419. In short, our holding in Carter I clearly did not preclude the district court from considering factors other than empirical evidence, and, as such, the district court did not err in upholding § 922(g)(3) by relying on "the narrowed design of the statute, the empirical and scholarly evidence[,] . . . the weight of precedent nationwide, and common sense."

B

Focusing on the substance of the studies presented by the government to the district court, Carter contends that the data were inadequate because they related to drug use generally rather than marijuana use specifically and because they failed to prove a causal relationship between marijuana use and violence. He maintains that the studies he submitted, by contrast, demonstrated that "marijuana users are not prone to violent behavior." (Emphasis added).

We have little trouble concluding that the studies presented to the district court by both the government and Carter indicate a strong link between drug use and violence. A study by Carrie Oser and colleagues, offered by the government, found that probationers who had perpetrated violence in the past were significantly more likely to have used a host of drugs -- marijuana, hallucinogens, sedatives, and heroin -- than

9

probationers who had never been involved in a violent episode.[2] A 2004 survey of prisoners by the Bureau of Justice, again offered by the government, found that almost 50% of all state and federal prisoners who had committed violent felonies were drug abusers or addicts in the year before their arrest, as compared to only 2% of the general population.[3] That survey also found that inmates who were dependent on drugs or abusing them were much more likely to have a criminal history.[4] The government also presented a study by Lana Harrison and Joseph Gfroerer, which found that individuals who used marijuana or marijuana and cocaine, in addition to alcohol, were significantly more likely to engage in violent crime than individuals who only used alcohol.[5] And finally, the government presented a study by Virginia McCoy and colleagues, which found

---

[2] Carrie B. Oser et al., The Drugs-Violence Nexus Among Rural Felony Probationers, 24 J. Interpersonal Violence 1285, 1293 tbl.1 (2009) (hereinafter Oser et al., Nexus).

[3] Bureau of Justice Statistics, U.S. Department of Justice, Drug Use and Dependence, State and Federal Prisons, 2004, at 7 & tbl.6 (2007) (hereinafter BJS Survey).

[4] BJS Survey, at 7 & tbl.7.

[5] Lana Harrison & Joseph Gfroerer, The Intersection of Drug Use and Criminal Behavior: Results from the National Household Survey on Drug Abuse, 38 Crime & Delinquency 422, 433 tbl.4 (1992) (hereinafter Harrison & Gfroerer, Intersection).

that chronic cocaine and opiate users were more likely than nonusers to engage in robbery and violence.[6]

Carter seeks to marginalize these studies, arguing first that they are too broad and discuss only "general categories of offenders, including those who abuse a range of controlled substances." He contends that, even if there is a link between "harder" controlled substances and violence, the government's evidence does not indicate that marijuana users are prone to violence. To the contrary, he claims that the evidence he submitted disproves such a link. Yet, even if such a particularized demonstration is necessary -- an issue we need not reach -- the studies presented by the government amply demonstrate a connection between marijuana use specifically and violence. The Harrison and Gfroerer study, for instance, found that, "[e]ven after controlling for other variables[,] such as age, race, income, education, and marital status, . . . using marijuana in the past year . . . [was] significantly related to criminal behavior."[7] Also, the study by Oser and colleagues

---

[6] H. Virginia McCoy et al., Perpetrators, Victims, and Observers of Violence: Chronic and Non-Chronic Drug Users, 16 J. Interpersonal Violence 890, 900 (2001).

[7] Harrison & Gfroerer, Intersection, at 432-35 & tbl. 6. The study used logistic regression and found that individuals who used marijuana in the past year were more than twice as

11

found that, among probationers, individuals who had been involved in violence were more likely to have used marijuana.[8] Finally, the 2005 National Survey on Drug Use and Health found that individuals arrested for a serious violent or property offense in the last year were much more likely than non-arrestees to have used marijuana.[9]

Moreover, the evidence that Carter offered to refute the link between marijuana use and violence -- a study by Evelyn Wei and colleagues[10] -- actually provides additional evidence that marijuana use and violence coincide.[11]  The Wei study tracked the

---

likely to report both committing and being booked for violent crimes.

[8] Oser et al., Nexus, at 1293 tbl.1.

[9] Office of Applied Studies, Substance Abuse and Mental Health Services Administration, National Survey on Drug Use and Health:  Illicit Drug Use Among Persons Arrested for Serious Crimes (2005).  This survey found that 46.5% of individuals arrested for a violent offense (murder, rape, robbery, or aggravated assault) or a property offense (burglary, theft, motor vehicle theft, or arson) had used marijuana in the past year, compared to 10.0% of those not arrested for any serious offense.

[10] Evelyn H. Wei et al., Teasing Apart the Developmental Associations Between Alcohol and Marijuana Use and Violence, 20 J. Contemp. Crim. Just. 166 (2004) (hereinafter Wei et al., Teasing Apart).

[11] Carter also presented a 2003 "West Virginia Drug Threat Assessment" report to cast doubt on the link between marijuana use and violence based on its statement that "[m]arijuana distributors in West Virginia occasionally commit violent crimes

behavioral development of "inner-city adolescent males" for ten years and found that, "at age 18, frequent marijuana users were 11 times more likely than nonfrequent users to . . . engage in violence."[12] The study also found that marijuana use in one year frequently predicted violence in the subsequent year.[13] Carter argues nonetheless that the Wei study militates in his favor because, when it controlled for "risk factors," the correlation between marijuana use in adolescence and violence in young adulthood was not statistically significant.[14] In this instance, we do not think that the Wei study's failure to identify a

---

to protect their product and turf; however, marijuana abusers rarely commit violent crimes." National Drug Intelligence Center, U.S. Department of Justice, West Virginia Drug Threat Assessment 13 (2003). This conclusory statement, however, lacks any empirical or even anecdotal support, and therefore we accord it no weight.

[12] Wei et al., Teasing Apart, at 171, 176.

[13] Wei et al., Teasing Apart, at 177 & tbl.3.

[14] Wei et al., Teasing Apart, at 177-178 & tbl.3. To provide a bit more detail: Wei and colleagues used logistic regression to measure whether marijuana use in adolescents aged 11 to 14 was correlated with their engaging in violence when they were aged 15 to 20. To isolate the effect of marijuana use, Wei and colleagues controlled for various "risk factors": self-reported property crime, low academic achievement, poor communication with caretaker, caretaker perception of bad neighborhood, African-American ethnicity, and hard drug use. After controlling for those variables, they found that adolescents who used marijuana were still 1.91 times more likely to engage in violence later in young adulthood. However, Wei and colleagues called this relationship "spurious" because the p-value was only 0.068. Id. at 178.

statistically significant correlation is particularly relevant.[15] Indeed, we note that the study, even when controlling for risk factors, still found that adolescents who used marijuana were almost twice as likely to engage in violence when they became young adults. Thus, the Wei study, far from undercutting the government's position, provides it with strong support.

Carter also objects to the government's evidence on the grounds that it demonstrated, at most, a correlation between marijuana use and violence and not a causal relationship. Quoting the Wei study, he argues that "[t]he relationship between marijuana use and violence 'is due to the selection effects whereby these behaviors tend to co-occur in certain individuals, not because one behavior causes the other.'" (Emphasis added) (quoting Wei et al., Teasing Apart, at 166).

This argument is flawed, however, because it assumes, incorrectly, that Congress may not regulate based on correlational evidence. We conclude that it may and that the

_____

[15] First, we think it rather irrelevant to § 922(g)(3) -- which concerns active unlawful drug users -- whether marijuana use among adolescents predicts violence years later. Second, one of Wei's "risk factors" was hard drug use. But Congress would be well within its rights in disarming marijuana users if such users were more likely to engage in violence because of their hard drug use. Controlling for hard drug use improperly weakened the correlation. Third, and most critically, a p-value of 0.068 indicates that there was only a 6.8% chance that the correlation was due to chance. Scientists may insist on p-values of 0.05, but Congress is not so constrained.

14

government need not prove a causal link between drug use and violence in order to carry its burden of demonstrating that there is a reasonable fit between § 922(g)(3) and an important government objective.  See Staten, 666 F.3d at 164-67 (upholding § 922(g)(9)'s disarmament of those convicted of a misdemeanor of domestic violence in large part based on correlational evidence about recidivism rates).  Indeed, the studies put forward by both Carter and the government in this case illustrate just how powerful correlational evidence can be.  The Harrison and Gfroerer study and the Wei study both used logistic regression to show that individuals who used marijuana were much more likely to engage in violence, even controlling for multiple demographic and behavioral variables including age, race, economic status, marital status, and educational level.  While eliminating these potentially confounding variables does not prove that marijuana use causes violence, it substantially bolsters the link and helps to justify regulating gun possession by marijuana users.  We have emphasized that, under intermediate scrutiny, the fit between the regulation and the harm need only be reasonable, not perfect.  Carter I, 669 F.3d at 417.  The correlational evidence put forward by the parties in the present case easily clears that bar.

While the empirical data alone are sufficient to justify the constitutionality of § 922(g)(3), we find that common sense

provides further support. In Carter I, we noted the government's argument that "due to the illegal nature of their activities, drug users and addicts would be more likely than other citizens to have hostile run-ins with law enforcement officers, which would threaten the safety of the law enforcement officers when guns are involved." 669 F.3d at 419. The government also warned that "the inflated price of illegal drugs on the black market could drive many addicts into financial desperation, with the common result that the addict would be 'forced to obtain the wherewithal with which to purchase drugs through criminal acts either against the person or property of another or through acts of vice such as prostitution or sale of narcotics.'"[16] Id. Finally, the government suggested that drugs "impair [users'] mental function . . . and thus subject others (and themselves) to irrational and unpredictable behavior."[17] Id. at 420 (omission in original) (internal quotation marks omitted); see also United States v. Dugan, 657 F.3d 998, 999 (9th Cir. 2011) ("Habitual drug users . . . more likely will

---

[16] This hypothesis finds support in the evidence submitted by the government, which indicates that approximately 18% of federal and state prisoners committed their crimes in order to obtain money for drugs. BJS Survey, at 6. This figure rises to 30% for state prisoners arrested for property offenses. Id.

[17] This suggestion was also borne out by the government's evidence, which reports that 32% and 26% of state and federal prisoners, respectively, were using drugs at the time of their offense. BJS survey, at 5.

have difficulty exercising self-control, particularly when they are under the influence of controlled substances"). We find all three of these observations convincing, and Carter has provided no argument grounded in either logic or evidence to undercut them.

Finally, we observe that every court to have considered the issue has affirmed the constitutionality of § 922(g)(3) under the Second Amendment. See, e.g., Dugan, 657 F.3d at 999; United States v. Yancey, 621 F.3d 681, 682 (7th Cir. 2010) (per curiam); United States v. Seay, 620 F.3d 919, 925 (8th Cir. 2010); United States v. Richard, 350 F. App'x 252, 260 (10th Cir. 2009). Indeed, the majority of these courts found the statute constitutional without relying on any empirical studies. See Dugan, 657 F.3d at 999; Seay, 620 F.3d at 925; Richard, 350 F. App'x at 260.

At bottom, we conclude that the empirical evidence and common sense support the government's contention that drug use, including marijuana use, frequently coincides with violence. Carter has failed to present any convincing evidence that would call this conclusion into question. Accordingly, we join our sister circuits in holding that § 922(g)(3) proportionally advances the government's legitimate goal of preventing gun

violence and is therefore constitutional under the Second Amendment.  The judgment of the district court is

AFFIRMED.