PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

NICOLAS CARPIO-LEON,

*Defendant-Appellant.*

No. 11-5063

Appeal from the United States District Court
for the District of South Carolina, at Orangeburg.
Margaret B. Seymour, District Judge.
(5:11-cr-00372-MBS-1)

Argued: September 21, 2012

Decided: December 14, 2012

Before TRAXLER, Chief Judge, and NIEMEYER and
MOTZ, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Chief Judge Traxler and Judge Motz joined.

## COUNSEL

**ARGUED:** Douglas Neal Truslow, Columbia, South Carolina, for Appellant. Robert Frank Daley, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee. **ON BRIEF:** William N. Nettles, United States

Attorney, J.D. Rowell, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

After Nicolas Carpio-Leon, a citizen of Mexico, was indicted for possessing firearms while being "illegally or unlawfully in the United States," in violation of 18 U.S.C. § 922(g)(5), he filed a motion to dismiss the charge, contending that § 922(g)(5) violated his rights under the Second and Fifth Amendments to the United States Constitution. The district court denied Carpio-Leon's motion, and Carpio-Leon then pleaded guilty to that charge, as well as to an illegal entry charge, reserving, as part of his plea agreement, the right to appeal the district court's conclusion that § 922(g)(5) is constitutional.

Concluding that § 922(g)(5) is constitutional, we affirm. On Carpio-Leon's Second Amendment challenge, we conclude that the scope of the Second Amendment does not extend to provide protection to illegal aliens, because illegal aliens are not law-abiding members of the political community and aliens who have entered the United States unlawfully have no more rights under the Second Amendment than do aliens outside of the United States seeking admittance. On Carpio-Leon's Fifth Amendment challenge, we conclude that prohibiting illegal aliens, as a class, from possessing firearms is rationally related to Congress' legitimate interest in public safety.

I

Following a consensual search of Carpio-Leon's home on February 24, 2011, in Orangeburg, South Carolina, Immigra-

tion and Customs Enforcement agents recovered a .22 caliber Marlin rifle, a 9 mm Hi-Point model C pistol, and ammunition. Carpio-Leon admitted that he had stored the firearms in his master bedroom and that he was in the United States illegally. He was thereafter indicted in two counts charging him with (1) possession of a firearm by an alien "illegally or unlawfully in the United States," in violation of 18 U.S.C. § 922(g)(5)(A); and (2) illegal entry into the United States, in violation of 8 U.S.C. § 1325(a)(2).

Carpio-Leon filed a motion to dismiss Count I on the ground that § 922(g)(5) violates his rights under the Second Amendment and the Due Process Clause of the Fifth Amendment. At the hearing on the motion, he introduced evidence that he and his wife had lived in Orangeburg for some 13 years and had three children, all of whom were born in the United States; that he had no prior criminal record; that he had filed income tax returns; and that "a .22 caliber and a 9 mm pistol could be the type of arms one would use for protection of their homes and children." He also stipulated that he was in the United States illegally and that he had used a false social security number to obtain a driver's license.

The district court denied Carpio-Leon's motion, concluding that "*Heller* [554 U.S. 570 (2008)] and other Supreme Court precedent foreclose [his] argument that aliens illegally present in the United States are among those protected by the Second Amendment." Alternatively, the court ruled that § 922(g)(5) survives intermediate scrutiny, the relevant standard, because "[g]iven Congress's legitimate concerns about the dangers potentially posed by individuals who have violated this country's immigration laws and either entered or remain present inside its borders illegally, § 922(g)(5)(A) reasonably addresses the governmental objective of keeping firearms out of the possession of illegal aliens." The court rejected Carpio-Leon's Fifth Amendment claim because it found, for the same reasons given in its analysis of his Second Amendment claim,

that § 922(g)(5) does not deprive Carpio-Leon of any funda-
mental constitutional right.

After the court denied his motion to dismiss, Carpio-Leon
entered a conditional guilty plea to both counts of the indict-
ment, reserving the right to appeal the issue of § 922(g)(5)'s
constitutionality. The court sentenced Carpio-Leon on Octo-
ber 25, 2011, to time served on Count I and to six months'
imprisonment on Count II, with both sentences to run concur-
rently. It ordered two years' supervised release on Count I
and, as additional conditions, directed Carpio-Leon (1) "to
surrender to a duly-authorized immigration official for depor-
tation consideration in accordance with established proce-
dures provided by the Immigration and Naturalization Act, 8
U.S.C. § 1101 et seq." and (2) "not [to] re-enter the United
States for the duration of supervised release and not without
the approval of the United States Attorney General or the Sec-
retary of Homeland Security."

This appeal followed.

II

Carpio-Leon contends that possession of firearms typically
used for self-defense in one's home is protected by the Sec-
ond Amendment, even when such possession is by an illegal
alien. Recognizing the historical analysis required in constru-
ing the Second Amendment, he argues that the Second
Amendment could not have been intended to exclude illegal
aliens from its scope because "in 1791, attitudes toward immi-
gration were the reverse of today's attitudes" and "immigrants
—also known as 'settlers'—were deemed absolutely neces-
sary to the development and survival of the new nation."
Carpio-Leon also argues that "there is no empirical evidence
demonstrating that undocumented workers (in their homes)[,]
the classification into which [he] falls[,] are any more danger-
ous to society than legal aliens or, for that matter, native born
United States citizens." Thus, he asserts, § 922(g)(5) is not

narrowly tailored "to serve a compelling government interest."

The government contends that the Second Amendment does not protect illegal aliens because it "codified a preexisting right [to bear arms] that historically has been enjoyed [only] by *law-abiding*, responsible citizens, and illegal aliens are necessarily not law abiding." In any event, it argues that § 922(g)(5) survives intermediate scrutiny by serving an important interest in public safety. It also notes that Congress has "broad power over immigration-related matters and can choose to disarm illegal aliens."

We have not had occasion to address a Second Amendment challenge to 18 U.S.C. § 922(g)(5). The Fifth, Eighth, and Tenth Circuits, however, have upheld the provision in the face of a Second Amendment challenge, and we have found no court of appeals decision that has found it unconstitutional. The Fifth Circuit and the Eighth Circuit held that the protection of the Second Amendment does not extend to illegal aliens. *See United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1969 (2012); *United States v. Flores*, 663 F.3d 1022, 1023 (8th Cir. 2011) (per curiam), *cert. denied*, No. 11-9452, 2012 WL 993946 (U.S. June 25, 2012). And the Tenth Circuit avoided the question of whether illegal aliens are protected by the Second Amendment and upheld § 922(g)(5) because it passed intermediate scrutiny. *See United States v. Huitron-Guizar*, 678 F.3d 1164, 1169–70 (10th Cir. 2012).

As we have previously observed, "[a]ny Second Amendment analysis must now begin with the Supreme Court's recent seminal decision in *Heller*, which held that the Second Amendment [providing that 'the right of the people to keep and bear Arms, shall not be infringed'] codified a '*preexisting*' right that allows individuals to keep and bear arms." *United States v. Carter*, 669 F.3d 411, 414 (4th Cir. 2012) (citing *District of Columbia v. Heller*, 554 U.S. 570, 592, 595

(2008)). In *Heller*, the Court, finding that the Second Amendment protects an *individual* right to bear arms, struck down the District of Columbia's bans on handgun possession in the home and on having a firearm in the home that is immediately operable. *Heller*, 554 U.S. at 635. But in doing so, the Court cautioned that the right to bear arms has limits. "Of course the right [to bear arms] [is] not unlimited, just as the First Amendment's right of free speech [is] not." *Id.* at 595.

Thus, the Second Amendment does not guarantee the right to possess for *every purpose*, to possess *every type of weapon*, to possess at *every place*, or to possess by *every person*. *See United States v. Chester*, 628 F.3d 673, 676 (4th Cir. 2010) ("Significantly, *Heller* recognized that the right to keep and bear arms, like other Constitutional rights, is limited in scope and subject to some regulation"); *Carter*, 669 F.3d at 415 (explaining that under *Heller*, "the right to keep and bear arms depends not only on the purpose for which it is exercised but also on the relevant characteristics of the person invoking the right"); *Huitron-Guizar*, 678 F.3d at 1166 ("The right to bear arms, however venerable, is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why'"). As the *Heller* Court itself enumerated the limitations, the Constitution does not "protect the right of citizens to carry arms for *any sort* of confrontation," 554 U.S. at 595; the right to bear "arms" does not guarantee the right to possess every type of weapon, *id.* at 627; and not every person has the right to possess a firearm—"[N]othing in our opinion should be taken to cast doubt on long-standing prohibitions on the possession of firearms by felons and the mentally ill," *id.* at 626-27. The Court also noted that the "presumptively lawful regulatory measures" it identified were only "examples" and that its list did "not purport to be exhaustive." *Id.* at 627 n.26.

To apply *Heller*, we follow the two-step approach set forth in *Chester*, asking first

> whether the challenged law imposes a burden on
> conduct falling within the scope of the Second

Amendment's guarantee. This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. If it was not, then the challenged law is valid.

*Chester*, 628 F.3d at 680 (internal quotation marks and citations omitted). If, however, the regulation is found to burden conduct that falls within the scope of the Second Amendment's protections, "we move to the second step of applying an appropriate form of means-end scrutiny." *Id.*

Employing this analytical structure here, we start by determining whether the scope of the Second Amendment includes the protection of aliens who are illegally in this country.

Beginning with the text, the Second Amendment provides that "the right *of the people* to keep and bear Arms shall not be infringed." U.S. Const. amend. II (emphasis added). In providing its protection to "the people," the Amendment is distinguishable from the Fifth and Fourteenth Amendments, which provide protections to "persons." As *Heller* noted, the term "the people" is a "'term of art,'" which is also used in the First and Fourth Amendments, that "'refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.'" *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).

*Heller* does not make clear, however, whether illegal aliens can ever be part of the political community and therefore be included in the class of persons labeled "the people." *Heller* does frequently connect arms-bearing and "citizenship." For example, its analysis of the phrase "right of the people" ends by concluding, "We start therefore with a strong presumption that the Second Amendment right is exercised individually and belongs to all *Americans*." *Heller*, 554 U.S. at 581

(emphasis added); *see also id.* at 595, 625, 635 (connecting citizenship and the right to bear arms). We should be cautious, however, in assuming that the Court defined "the people" as excluding illegal aliens because the Court used *Verdugo-Urquidez* to explain the meaning of "the people." In *Verdugo-Urquidez*, the Court noted that its assumption in *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984), that the Fourth Amendment applies to illegal aliens is not "dispositive of how the Court would rule on a Fourth Amendment claim by illegal aliens in the United States if such a claim were squarely before [it]." *Verdugo-Urquidez*, 494 U.S. at 272. Though *Verdugo-Urquidez* certainly did not rule out the possibility that illegal aliens have only limited Fourth Amendment rights, it did not rule on whether illegal aliens were part of "the people." *Id.* at 272–73. The Supreme Court's precedent is therefore not clear on whether "the people" includes illegal aliens.

Here, we need not limit our analysis to the scope of the term "the people" and thereby become enmeshed in the question of whether "the people" includes illegal aliens or whether the term has the same scope in each of its constitutional uses.*

---

*Were we to limit our analysis to the scope of the term "the people," we would also have to recognize that groups like women, Native Americans, and blacks may not have been part of the political community at the time of the founding but are today within the class that we refer to as "the people." In this same vein, it was understood that Catholics could be disarmed in England prior to the founding, but again today they are within the class that we refer to as "the people." The *Heller* Court accepted this analytical approach when it determined what today may be classified as "arms." It stated:

> Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, e.g., *Reno v. American Civil Liberties Union*, 521 U.S. 844, 849 (1997), and the Fourth Amendment applies to modern forms of search, e.g., *Kyllo v. United States*, 533 U.S. 27, 35–36 (2001), the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.

*Heller*, 554 U.S. at 582.

This is because *Heller* concludes, through a distinct analysis, that the core right historically protected by the Second Amendment is the right of self-defense by "'*law-abiding*, responsible citizens.'" *Carter*, 669 F.3d at 416 (emphasis added) (quoting *Heller*, 554 U.S. at 635); *see also United States v. Moore*, 666 F.3d 313, 319 (4th Cir. 2012) (holding that a defendant with prior felony and violent crime convictions "simply does not fall within the category of citizens to which the *Heller* court ascribed the Second Amendment protection of 'the right of *law-abiding responsible* citizens to use arms in defense of hearth and home'" (quoting *Heller*, 554 U.S. at 635)); *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) (identifying the "fundamental," core right of the Second Amendment as self-defense in the home by a *law-abiding* citizen) (emphasis added), *cert. denied*, 132 S. Ct. 756 (2011).

The *Heller* Court reached the Second Amendment's connection to law-abiding citizens through a historical analysis, independent of its discussion about who constitutes "the people." *See Heller*, 554 U.S. at 579-81. The Court read *United States v. Miller*, 307 U.S. 174 (1939), to say that "the Second Amendment does not protect those weapons not typically possessed by *law-abiding* citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added). When looking at prior gun regulation, the Court found that "[f]or most of our history, the Bill of Rights was not thought applicable to the States, and the Federal Government did not significantly regulate the possession of firearms by *law-abiding* citizens." *Id.* (emphasis added). The Court was careful to note that its opinion should not be read to limit the government's ability to disarm individuals who cannot be trusted with firearms. *See id.* at 626 (stating that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill"). Finally, the Court concluded that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests

the right of *law-abiding, responsible citizens* to use arms in defense of hearth and home." *Id.* at 635 (emphasis added).

Even though the *Heller* Court stressed that the core right of the Second Amendment protects law-abiding members of the political community, it did not face a law prohibiting firearms possession by a particular class of persons. Nonetheless, we can employ the historical analysis it prescribed to apply its observations to this case, *see Chester*, 628 F.3d at 680, and thus to reach the conclusion that we do—that illegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection.

"[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (quoting *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (citing Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, Law & Contemp. Probs., Winter 1986, at 143, 146)). For example, felons "were excluded from the right to arms" because they were deemed unvirtuous. Reynolds, *supra*, at 480; *see also* David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 Mich. L. Rev. 588, 626 (2000) ("The average citizen whom the Founders wished to see armed was a man of republican virtue").

Colonial governments often barred "potential subversives" from owning firearms. Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140-41 (1994) (detailing colonial laws preventing "suspect populations" from owning firearms). In several colonial states, refusal to swear allegiance to the state or the country warranted disarmament. Saul Cornell & Nathan DeDino, *A Well*

*Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004) ("During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons refusing to swear an oath of allegiance to the state or the United States"); *see also* Saul Cornell, "*Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 671 (2002) (describing the right to bear arms in colonial Pennsylvania as a "civic right, one that was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner"). Similarly, after Shays' Rebellion, to obtain a pardon for taking up arms against the state, Massachusetts required swearing allegiance to the state and giving up firearms for three years. Cornell & DeDino, *supra*, at 507–08.

Also, several early proposals for the Bill of Rights demonstrate the understanding that the core protection of the Second Amendment belongs to law-abiding citizens. Delegates asked the Massachusetts Ratifying Convention to recommend barring Congress from "prevent[ing] the people of the United States, who are peaceable citizens, from keeping their own arms." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 681 (Leon Friedman et al. eds., 1971). The New Hampshire convention similarly proposed that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Id.* at 761.

Finally, the prefounding English right to bear arms supports this limitation of Second Amendment rights. *Cf. Heller*, 554 U.S. at 592–93 (analyzing the English law prior to the founding to interpret the operative clause of the Second Amendment). In England, the right to bear arms allowed the government to disarm those it considered disloyal or dangerous. *See* Patrick J. Charles, "*Arms for Their Defense"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be*

*Incorporated in McDonald v. City of Chicago*, 57 Clev. St. L. Rev. 351, 376, 382-83 (2009); Malcolm, *supra*, at 123.

Carpio-Leon's historical evidence does not controvert the historical evidence supporting the notion that the government could disarm individuals who are not law-abiding members of the political community. Carpio-Leon argues that the historical "attitudes toward immigration were the reverse of today's attitudes" and that "[c]onsidering the country's need for immigrants to settle frontier areas[,] . . . denying immigrants the right to defend themselves and their families would have been unthinkable." While this observation may be true, it does not suggest that individuals who were not considered to be part of the political community and who did not follow the community's rules were guaranteed the right to bear arms.

In reaching our conclusion that illegal aliens do not belong to the class of law-abiding members of the political community to whom the protection of the Second Amendment is given, we do not hold that any person committing any crime automatically loses the protection of the Second Amendment. The *Heller* Court's holding that defines the core right to bear arms by law-abiding, responsible citizens does not preclude some future determination that persons who commit some offenses might nonetheless remain in the protected class of "law-abiding, responsible" persons. We only hold here that *illegal aliens* do not fall in the class of persons who are classified as law-abiding members of the political community for the purpose of defining the Second Amendment's scope. *See Portillo-Munoz*, 643 F.3d at 440 (concluding that illegal aliens are not protected by the Second Amendment because "[i]llegal aliens are not 'law-abiding, responsible citizens'"); *Moore*, 666 F.3d at 319–20 ("Moore's three prior felony convictions for common law robbery and two prior convictions for assault with a deadly weapon on a government official clearly demonstrate that he is far from a law-abiding, responsible citizen" and therefore is not protected by the Second Amendment).

And we readily confirm our limited holding as to illegal aliens by their particular relationship to the United States. Defining aliens as illegal emanates from "the power to expel or exclude aliens [which is] a fundamental *sovereign attribute* exercised by the Government's political departments [that is] largely immune from judicial control." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) (emphasis added). Thus, the crime of illegal entry inherently carries this additional aspect that leaves an illegal alien's status substantially unprotected by the Constitution in many respects. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (noting that in *Kaplan v. Tod*, 267 U.S. 228, 230 (1925), "despite nine years' presence in the United States, an 'excluded' alien 'was still in theory of law at the boundary line and had gained no foothold in the United States'"); *see also Zadvydas*, 533 U.S. at 693 (noting the distinction between aliens who have and have not "effected an entry into the United States" and citing *Leng May Ma v. Barber*, 357 U.S. 185, 188-90 (1958) for the proposition that there is a difference between an alien only "paroled" into the United States and one who has "effected an entry"); *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 488 (1999) ("As a general matter—and assuredly in the context of claims such as those put forward in the present case—an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation").

And because the regulation of aliens' entry into the United States draws on the exercise of national sovereignty, "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews v. Diaz*, 426 U.S. 67, 81 (1976). It is well settled that decisions made by the political branches on immigration are subject only to a "narrow standard of review." *Id.* at 82. The Supreme Court, resting on the sovereign aspect of regulating aliens, "has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is

over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)).

Thus, when Congress regulates illegal aliens by prohibiting them from possessing firearms, *see* 18 U.S.C. § 922(g)(5), it is functioning in a special area of law committed largely to the political branches, *see Shaughnessy*, 345 U.S. at 210, and on which we owe Congress special deference, *Fiallo*, 430 U.S. at 792. Indeed, in addition to making the possession of firearms by illegal aliens a crime, Congress has also made Carpio-Leon's unexamined entry into the United States a crime. *See* 8 U.S.C. § 1325(a); *Plyler v. Doe*, 457 U.S. 202, 219 n.19 (1982) (noting that "entry into the class [of illegal aliens] is itself a crime").

For the reasons given, we hold that the Second Amendment right to bear arms does not extend to *illegal* aliens, and therefore, without the need of proceeding to the second step of *Chester*, we conclude that Carpio-Leon's constitutional challenge under the Second Amendment must fail.

## III

Carpio-Leon also contends that 18 U.S.C. § 922(g)(5) violates his right to equal protection under the Due Process Clause of the Fifth Amendment. Based on his claim that the right to bear arms in one's home for protection is a *fundamental* constitutional right, he argues that we should apply strict scrutiny in evaluating § 922(g)(5). Under strict scrutiny, he maintains, the statute is unconstitutional because no empirical evidence exists to justify "the statutory ban on undocumented workers' right to bear arms in their homes for the protection of their families."

The government contends that 18 U.S.C. § 922(g)(5) is subject to a rational basis review because illegal aliens do not have a fundamental right to bear arms. Under the rational-

basis level of scrutiny, which is a low hurdle, it notes that the government has a legitimate interest in public safety.

There is no disputing that illegal aliens are "persons" protected by the Fifth Amendment. *See Mathews*, 426 U.S. at 77 ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to [the] constitutional protection" of the Fifth and Fourteenth Amendments); *Plyler*, 457 U.S. at 210 ("[E]ven aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments"). And when, as here, no fundamental constitutional right is at stake, the appropriate standard of review is the rational-basis review. *See Mathews*, 426 U.S. at 82-83; *Huitron-Guizar*, 678 F.3d at 1167 (applying rational basis review to equal protection challenge of § 922(g)(5)); *Vongxay*, 594 F.3d at 1119 (applying rational basis review to prohibition against felons possessing firearms "because the right established by *Heller* does not apply to felons").

Carpio-Leon cannot show that there is no rational relationship between prohibiting illegal aliens from bearing firearms and the legitimate government goal of public safety. To the contrary, courts have identified numerous legitimate reasons why it would be dangerous to permit illegal aliens to arm themselves. For instance, illegal aliens are "harder to trace and more likely to assume a false identity[,] [o]r Congress may have concluded that those who show a willingness to defy our law are candidates for further misfeasance or at least a group that ought not be armed when authorities seek them." *Huitron-Guizar*, 678 F.3d at 1170. Illegal aliens are "likely to maintain no permanent address in this country, elude detection through an assumed identity, and—already living outside the law—resort to illegal activities to maintain a livelihood." *United States v. Toner*, 728 F.2d 115, 128-29 (2d Cir. 1984) (internal quotation marks omitted) (upholding precursor to § 922(g)(5)). More generally, the Supreme Court has "firmly and repeatedly endorsed the proposition that Congress may

make rules as to aliens that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 522 (2003). Congress therefore surely can rationally distinguish between legal aliens and illegal aliens.

The Omnibus Crime Control and Safe Streets Act of 1968 itself advances a rational basis for § 922(g)(5)'s prohibitions, finding that the possession of firearms by certain classes of persons, including "aliens who are illegally in the country" creates:

> (1) a burden on commerce or threat affecting the free flow of commerce,

> (2) a threat to the safety of the President of the United States and Vice President of the United States,

> * * *

> (4) a threat to the continued and effective operation of the Government of the United States and of the government of each State guaranteed by article IV of the Constitution.

Pub. L. No. 90-351, § 1201, 82 Stat. 236.

Carpio-Leon cites empirical studies that, he contends, show that undocumented workers are no more dangerous to society than are native born United States citizens. But the usefulness of such studies are at best limited and certainly do not focus on the class of *illegal* aliens, which is the basis for § 922(g)(5). Comparing incarceration rates of men born in the United States with the incarceration rates of foreign-born men does not establish that *unlawful* entrants are less dangerous. Those data compare incarceration rates based on a person's place of birth, not on whether a person is lawfully or unlawfully present in the United States. The other evidence cited by

Carpio-Leon is a comparison between the overall level of crime in the United States with the number of unlawful entrants. But again, this comparison is not useful because of the high number of variables. Carpio-Leon simply cannot show that Congress acted irrationally in concluding that those who are in the United States *illegally* should not be allowed to possess firearms.

Accordingly, we conclude that 18 U.S.C. § 922(g)(5) survives rational scrutiny and is, therefore, also constitutional under the Fifth Amendment.

The judgment of the district court is

*AFFIRMED*.