KAREN LeCRAFT HENDERSON, Circuit Judge, dissenting: Does an alien minor who attempts to enter the United States eight weeks pregnant—and who is immediately apprehended and then in custody for 36 days between arriving and filing a federal suit— have a constitutional right to an elective abortion? The government has inexplicably and wrongheadedly failed to take a position on that antecedent question. I say wrongheadedly because at least to me the answer is plainly—and easily—no. To conclude otherwise rewards lawlessness and erases the fundamental difference between citizenship and illegal presence in our country. The en banc Court endorses or at least has no problem with this result. By virtue of my colleagues’ decision, a pregnant alien minor who attempts to enter the United States illegally is entitled to an abortion, assuming she complies with state abortion restrictions once she is here. Under my colleagues’ decision, the minor need not have “developed substantial connections with this country,” United States v. Verdugo-Urquidez, 494 U.S. 259, 271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), as the plaintiff here plainly has not. Under my colleagues’ decision, the minor need not have “effected an entry into the United States,” Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), because the plaintiff here did not, see id. (alien “paroled intq the United States pending admissibility,” without having “gained [a] foothold,” has “not effected an entry”). Under my colleagues’ decision, it is difficult to imagine an alien minor anywhere in the world who will not have a constitutional right to an abortion in this country. Their action is at odds with Supreme Court precedent. It plows new and potentially dangerous ground. Accordingly, I dissent from the vacatur of the stay pending appeal. I. BACKGROUND In or about early July 2017, 17-year-old Jane Doe (J.D.) became pregnant. On or about September 7, 2017, she attempted to enter the United States illegally and unaccompanied. By J.D.’s own admission, authorities detained her “upon arrival.” District Court Docket Entry (Dkt. No.) 1-13 at 1. She has since remained in federal custody—in a federally funded shelter— because she is an “unaccompanied alien child.” 6 U.S.C. § 279(g)(2) (“unaccompanied alien child” is “a child who,” inter alia, “has no lawful immigration status in the United States” and “has not attained 18 years of age”). The Office of Refugee Resettlement (ORR) of the United States Department of Health and Human Seryices (HHS) is responsible for “unaccompanied alien children who are in Federal custody by reason of their immigration status.” 6 U.S.C § 279(b)(1)(A). In March 2008, HHS announced a “[p]olicy” that “[sjerious medical services, including ...' abortions, ... require heightened ORR involvement.” HHS, Medical Services Requiring Heightened ORR Involvement (Mar. 21, 2008), perma.cc/LDN8-JNL5. In March 2017, consistent with that policy, ORR further announced that shelter personnel “are prohibited from taking any action that facilitates an abortion without direction and approval from the Director of ORR.” Dkt. No. 3-5 at 2. According to the declaration of an ORR official, J.D. was physically examined while in custody and “was informed that she [is] pregnant.” Dkt. No. 10-1 at 2. J.D.’s counsel interprets the declaration to say that “J.D. did not learn that she was pregnant until after her arrival in the United States.” PL’s Opp. to Defs.’ Emergency Mot. for Stay' Pending Appeal' (Opp.) 22-23; see also Panel Dissent of Millett, J. (Panel Dissent) 2 (“After entering the United States, [J.D.] ... learned that she is pregnant.”). But the declaration does not rule out that J.D. knew she was pregnant even before the examination. Nor has J.D. herself alleged that she first learned of her pregnancy in this country. See generally Dkt. No. 1-13 at 1 (J.D.’s declaration in support of complaint). And it is highly likely she knew when she attempted to enter the United States that she was pregnant, as she was at least eight weeks pregnant at the time.[1] Notably, elective abortion is illegal in' J.D.’s home country. Oral Arg. Recording 29:19-29:34. J.D. requested an abortion. The evidence before us is that it is an elective abortion: nothing indicates it is necessary to preserve J.D.’s health.[2] J.D.’s request was relayed to the ORR Director, who denied it. On October 13, 2017—having spent a mere 36 days in the United States, all of them in custody—J.D. filed suit in district court, enlisting’ this country’s courts to vindicate (inter alia) her alleged Fifth Amendment right to an abortion. The next day, she applied for a temporary restraining order (TRO) and moved for a preliminary injunction. The government opposed J.D.’s application and motion. For reasons known only to the government, it did not take a position on whether J.D.—as an alien who attempted to enter the United States illegally and who has no substantial connections with this country—has any constitutional right to an abortion. Instead the government argued that ORR has placed no “undue burden” on the alleged right. Dkt. No. 10 at 11-16 (citing Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). At the TRO hearing, the district court repeatedly pressed the government about whether J.D. has a constitutional right to an abortion. The government emphasized that it was “not taking a ... position” but was “not going to give [the court] a concession” either. Opp., Supplement 14. The district court issued a TRO requiring that the government allow J.D. to be transported to an abortion provider for performance of the procedure. The government appealed the TRO to this Court and sought a stay pending appeal. At oral argument, the government repeatedly stated that it takes no position on whether J.D. has a constitutional right to an abortion, Oral Arg. Recording 8:10-8:46, 16:43-17:12, and that it instead “assumefs] for the purposes of .., argument” that she has such a right, Oral Arg. Recording 17:27-17:52.[3] On October 20, 2017, over a dissent, a motions panel of this Court issued an order directing the district court to allow HHS until close of business October 31 to find a suitable sponsor to take custody of J.D. so that HHS can release her from its custody. Without deciding whether J.D. has a constitutional right to an abortion, the panel concluded that a short delay to secure a sponsor does not unduly burden any alleged right if the process is expeditiously completed by close of business October 31. On October 22, 2017, J.D. filed a petition for rehearing en banc. Today, the Court grants the petition, vacates the panel’s October 20 order and denies the government’s motion for stay pending appeal “substantially for the reasons set forth in” the panel dissent. II. ANALYSIS As I noted at the outset, the en banc Court’s decision in effect means that a pregnant alien minor who attempts to enter the United States illegally is entitled to an abortion, assuming she complies with state abortion restrictions once she is here. Although the government has for some reason failed to dispute that proposition, it is not the law. A. We Can And Must Decide The Antecedent Question Of Whether J.D. Has A Constitutional Right To An Abortion. The Supreme Court has held that if a party “failfs] to identify and brief’ “an issue ‘antecedent to ... and ultimately dispositive of the dispute,” an appellate court may consider the issue sua sponte. U.S. Nat’l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 447, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (quoting Arcadia v. Ohio Power Co., 498 U.S. 73, 77, 111 S.Ct. 415, 112 L.Ed.2d 374 (1990)); cf. United States v. Bowie, 198 F.3d 905, 913 (D.C. Cir. 1999) (“We are never bound to accept the government’s confession of error” (citing Young v. United States, 315 U.S. 257, 258, 62 S.Ct. 510, 86 L.Ed. 832 (1942), United States v. Pryce, 938 F.2d 1343, 1351-52 (D.C. Cir. 1991) (Randolph, J., concurring))). Here, the question of whether J.D. has a constitutional right to an abortion is “antecedent to” any issue of undue burden. And the antecedent question is “dispositive of’ J.D.’s Fifth Amendment claim, at least now that my colleagues have reinstated the TRO on the apparent theory that the claim is likely meritorious. Accordingly, we can and should expressly decide the antecedent question. True, we should not ordinarily confront a broad constitutional question “if there is also present some other ground upon which the case may be disposed of,” Ashwander v. TVA, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandéis, J„ concurring), including if the alternative is a “narrower” constitutional ground, Greater New Orleans Broad. Ass’n v. United States, 527 U.S. 173, 184, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999).[4] But in the analogous context of qualified immunity, we are “permitted ... to avoid avoidance—that is, to determine whether a right exists before examining” the narrower question of whether the right “was clearly established” at the time an official acted. Camreta v. Greene, 563 U.S. 692, 706, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011). Our discretion in that area rests on the recognition that it “is sometimes beneficial to clarify the legal standards governing public officials.” Id. at 707, 131 S.Ct. 2020. The same interest is, to. put it mildly, implicated here. Border authorities, immigration officials and HHS itself would be well served to know ex ante whether pregnant alien minors who come to the United States in search of an abortion are constitutionally entitled to one. And under today’s decision, pregnant alien minors the world around seeking elective abortions will be on notice that they should make the trip.[5] Granted, because of the government’s failure to take a position,[6] we in theory have discretion not to decide the antecedent question. But in reality the ship has sailed: as a result of my colleagues’ decision, J.D. will soon be- on her way to an abortion procedure she would not receive absent her invocation of the Fifth Amendment. If ever there were a case in .which the public interest compels us to exercise .our “independent power to identify and apply the proper construction of , governing law” irrespective of a party’s litigating position, U.S. Nat'l Bank of Or., 508 U.S. at 446, 113 S.Ct. 2173 (quoting Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991)), this is it. The stakes, both in the short run and the long, could scarcely be higher. B. J.D. Has No Constitutional Right To An Abortion. J.D. is not a U.S. citizen. She is not a permanent resident, legal or otherwise. According to the record, she has no connection to the United States, let alone “substantial” connections. Despite her physical presence, in the United States, J.D. has never entered the United States as a matter of law and cannot avail herself of the constitutional rights afforded those legally within our borders. Accordingly, under a correct interpretation of the law, J.D. has virtually no likelihood of success on the merits and the TRO issued by the district court should remain stayed. See Mazurek v. Armstrong, 520 U.S. 968, 970, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (preliminary injunctive relief unavailable if the plaintiff cannot establish a likelihood of success on the merits), “The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law.” Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). Thus a young girl detained at Ellis Island for a year, and then released to live with her father in the United States for nearly a decade, “was to be regarded as stopped at the boundary line and kept there unless and until her right to enter should be declared.” Kaplan v. Tod, 267 U.S. 228, 230, 45 S.Ct. 257, 69 L.Ed. 585 (1925). Even after she was no longer detained, “[s]he was still in theory of law at the boundary line and had gained no foothold in the United States.” Id. Nearly six decades ago the Supreme Court had already said that “[f]or over a half century this Court has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States.” Leng May Ma v. Barber, 357 U.S. 185, 188, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958). Aliens who have entered the United States—even if illegally—enjoy “additional rights and privileges not extended to those ... who are merely ‘on the threshold of initial entry/” Id. at 187, 78 S.Ct. 1072 (quoting Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953)). “[Alliens receive constitutional protections when they have come within the territory of the, United States and developed substantial connections with this country.” United States v. Verdugo-Urquidez, 494 U.S. 259, 271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). Until then—before developing the"’“substantial connections” ‘that constitute “entry” for an illegally present alien—“[t]he Bill' of Rights is a futile authority for -the alien seeking admission for the first time to these shores.” Bridges v. Wixon, 326 U.S. 135, 161, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) (Murphy, J., concurring), . We have repeatedly recognized this principle, as have our sister circuits and, most. important, as has the Supreme Court. See Kerry v. Din, — U.S. -, 135 S.Ct. 2128, 2140, 192 L.Ed.2d 183 (2015) (Kennedy, J., concurring in the judgment); Demore v. Kim, 538 U.S. 510, 546, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003); Shaughnessy, 345 U.S. at 215, 73 S.Ct. 625; Kaplan, 267 U.S. at 230, 45 S.Ct. 257; United States v. Ju Toy, 198 U.S. 253, 263, 25 S.Ct. 644, 49 L.Ed. 1040 (1905) (alien petitioner, “although physically within our boundaries, is to be regarded as if he had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate”); Kiyemba v. Obama, 555 F.3d 1022, 1036-37 n.6 (D.C. Cir. 2009) (Rogers, J., concurring in the judgment) (quoting Mezei, Leng May' Ma and Ju Toy in support of proposition that habeas court can. order detainee brought within U.S. territory without thereby effecting detainee’s “entry” for any ‘other purpose), vacated on other grounds, 559 U.S. 131, 130 S.Ct. 1235, 175 L.Ed.2d 1070 (2010); Ukrainian-Am. Bar Ass’n, Inc. v. Baker, 893 F.2d 1374, 1383 (D.C. Cir. 1990) (Sentelle, J., concurring) (summarizing the entry doctrine).[7] Because she has never entered the United States, J.D. is not entitled to the due process protections of the Fifth Amendment. See Albathani v. INS, 318 F.3d 365, 375 (1st Cir. 2003) (“As an unadmitted alien present in the United States, Albathani’s due process rights are limited”). This is, or should be, clear from „the controlling and persuasive authorities marshaled above, which are only a fraction of the whole. Even if J.D. did enjoy the protections of the Due Process Clause, however, due process is not an “all or nothing” entitlement. In some cases “[ijnformal procedures will suffice,” Goldberg v. Kelly, 397 U.S. 254, 269, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); “consideration of what procedures due process may require” turns on “the precise nature of the government function” and the private interest. Cafeteria Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). What the Congress and the President have legitimately deemed appropriate for aliens “on the threshold” of our territory, the judiciary may not contravene. “It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicile or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter.... As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by congress, are due process of law.” Nishimura Ekiu v. United States, 142 U.S. 651, 660, 12 S.Ct. 336, 35 L.Ed. 1146 (1892) (emphasis added). There is a “class of cases” in which “the acts of executive officers, done under the authority of congress, [are] conclusive.” Murray’s Lessee v. Hoboken Land & Imp. Co., 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372 (1855). Among that class of cases are those brought by aliens abroad, including those who are “abroad” under the entry doctrine. See Din, 135 S.Ct. at 2139-40 (Kennedy, J., concurring in the judgment); Kleindienst v. Mandel, 408 U.S. 753, 769-70, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). Mandel teaches that the Congress’s “plenary power” over immigration requires the courts to strike a balance between private and public interests different from the due process that typically obtains. The Supreme Court “without exception has sustained” the Congress’s power to exclude aliens, a power “inherent in sovereignty,” consistent with “ancient principles” of international law and “to be exercised exclusively by the political branches of government.” Mandel, 408 U.S. at 765-66, 92 S.Ct. 2576. Indeed, “over no conceivable subject is the legislative power of Congress more complete.” Id. at 766, 92 S.Ct. 2576 (quoting Oceanic Navigation Co. v. Stranahan, 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909)) (alteration omitted). The Congress’s power to exclude includes the power “to prescribe the terms and conditions upon which [aliens] may come to this country, and to have its declared policy in that regal’d enforced exclusively through executive officers, without judicial intervention.” Id. (quoting Lem Moon Sing v. United States, 158 U.S. 538, 547, 15 S.Ct. 967, 39 L.Ed. 1082 (1895)). Whatever the merits of different applications of due process “were we writing on a clean slate,” “the slate is not clean.” Id. (quoting Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954)). We must therefore yield to the Executive, exercising the power lawfully delegated to him, when he “exercises this power negatively on the basis of a facially legitimate and bona fide reason.” Id. at 770, 92 S.Ct. 2576. Moreover, this deference is required even when the constitutional rights of U.S. citizens are affected: we may not “look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests” of citizens “who seek personal communication with” the excluded alien. Id. Thus in Mandel, the Executive permissibly prohibited an alien communist intellectual to travel to the United States, where he had been scheduled to speak at several universities. Applying Mandel, the Supreme Court recently approved the Executive’s denial of entry to an Afghan man whose U.S.-citizen wife was waiting for him in this country. Din, 135 S.Ct. at 2131 (plurality opinion). The Court in Din was divided not only over whether the wife had any due process interest in her husband’s attempt to immigrate but also over whether that hypothetical interest had been infringed. Compare id. (plurality opinion) (three justices concluding that there is no due process right “to live together with [one’s] spouse in America”), with id. at 2139 (Kennedy, J., concurring in the judgment) (two justices concluding that, even if such a right exists, the Government’s visa-denial notice is all that due process can require). Citing Man-del, Justice Kennedy reasoned that the government’s action in Din was valid, even though it “burden[ed] a citizen’s own constitutional rights,” because it was made “on the basis of a facially legitimate and bona fide reason.” Id. at 2139 (Kennedy, J., concurring in the judgment) (quoting Mandel, 408 U.S. at 770, 92 S.Ct. 2576).[8] Justice Scalia, writing for himself, the Chief Justice and Justice Thomas, criticized the dissent’s endorsement of the novel substantive due process right asserted by the plaintiff, which he characterized as, “in any world other than the artificial world of ever-expanding constitutional rights, nothing more than a deprivation of her spouse’s freedom to immigrate into America.” Id. at 2131 (plurality opinion). Mandel applies with all the more force here, where a substantive due process right is asserted not by a U.S. citizen, nor by a lawful-permanent-resident alien, nor even by an illegally resident alien, but by an alien minor apprehended attempting to cross the border illegally and thereafter detained by the federal government.. If J.D. can be detained indefinitely—which she can be,, see Zadvydas, 533 U.S. at 693, 121 S.Ct. 2491 (distinguishing Shaughnessy, 345 U.S. 206, 73 S.Ct. 625)—and if she can be returned to her home country to prevent her from engaging in disfavored political speech in this country—which she can be, Mandel, 408 U.S. at 770, 92 S.Ct. 2576—and if she can be paroled into the United States for a decade or more, Kaplan, 267 U.S. at 230, 45 S.Ct. 257, register for the draft, Ng Lin Chong v. McGrath, 202 F.2d 316, 317 (D.C. Cir. 1952), and see her parents naturalized, Gonzalez v. Holder, 771 F.3d 238, 239 (5th Cir. 2014), only, for her still to be deported with cursory notice, 8 U.S.C, § 1225—then she cannot successfully assert a due process right to an elective abortion. . In concluding otherwise, the Court elevates the right to elective abortion above every other constitutional entitlement. Freedom of expression, Mandel, 408 U.S. at 770, 92 S.Ct. 2576, freedom of association, Galvan, 347 U.S. at 523, 74 S.Ct. 737, freedom to keep and bear arms, United States v. Carpio-Leon, 701 F.3d 974, 976 (4th Cir. 2012), freedom from warrantless search, Verdugo-Urquidez, 494 U.S. at 274-75, 110 S.Ct. 1056, and freedom from trial without jury, Johnson v. Eisentrager, 339 U.S. 763, 784-85, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) all must yield to the “plenary authority” of the Congress and the Executive, acting in concert, to regulate immigration; but the freedom to terminate one’s pregnancy is more fundamental than them all? This is not the law.[9] The panel dissent warned of outlandish scenarios that will follow from staying the TRO,[10] Panel Dissent 9, but-a stay maintains the legal status quo. The United States remains a signatory to the U.N. Convention Against Torture; our law imposes civil liability on government agents who commit torts and criminal liability on those who commit crimes; and counsel have access to detained alien minors, as have J.D.’s counsel. The Constitution does not, and need not, answer every question but diabetics, rape. victims and women whose pregnancies threaten their lives are nevertheless provided for. Contra Panel Dissent 9. Although the panel dissent found “deeply troubling” the argument “that J.D. is not a person in the eyes of" our Constitution,” the argument is nevertheless correct.[11] The panel dissent’s contrary conclusion is based on a misunderstanding of the Supreme Court’s immigration due process decisions, including a mistaken reliance on the dissent in Jean v. Nelson, 472 U.S. 846, 875, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (Marshall, J., dissenting). Writing for the Court in Jean, thén-Justice Rehnquist expressly declined to opine on the alien plaintiffs’ due process rights, see id. at 857, 105 S.Ct. 2992 (majority opinion), much less to hold—as Justice Marshall would have done—that “regardless of immigration status, aliens within the territorial jurisdiction of the United States are ‘persons’ entitled to due process under the Constitution.” The Supreme Court has never so held.[12] Contra Panel Dissent 9. It is the panel dissent’s (and now the Court’s) position that will unsettle the law, potentially to dangerous effect. Having discarded centuries of precedent and policy, the majority offers no limiting principle to constrain this Court or any other.from following today’s decision to its logical end. If the Due Process Clause applies to J.D. with full force, there will be no reason she cannot donate to political campaigns, despite 52 U.S.C. § 30121’s prohibition. on contributions by nonresident foreign nationals inasmuch^ as freedom of political expression is plainly fundamental to our system of ordered liberty. See Citizens United v. FEC, 558 U.S. 310, 340, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). I see no reason that she may not possess a firearm, notwithstanding 18 U.S.C. § 922(g)(5)’s prohibition on doing so while “illegally or unlawfully in the United States,” see Carpio-Leon, 701 F.3d at 975, inasmuch as “the Second Amendment conferred an individual right to keep and bear arms,” District of Columbia v. Heller, 554 U.S. 570, 595, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), in recognition of the “basic right” of self-defense, McDonald v. City of Chicago, 561 U.S. 742, 767, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). Even the government’s ability to try accused war criminals before U.S. military commissions in theater must be reconsidered as it is premised on the Fifth-Amendment’s territoriality requirement, which today, by vacating the stay, the Court has so[1] summarily eroded. See Eisentrager, 339 U.S. at 784-85, 70 S.Ct. 936. Heedless of the entry doctrine, its extensive pedigree in our own precedent and its controlling effect in this case, the Court today assumes away the question of what (if any) process is due J.D. and proceeds to a maximalist application of some of the most controverted case law in American jurisprudence. It does so over the well-founded objections of an Executive authorized to pursue its legitimate interest in protecting fetal life. See Gonzales v. Carhart, 550 U.S. 124, 145, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) (“the government has a legitimate and substantial interest in preserving and promoting fetal life”); Casey, 505 U.S. at 853, 112 S.Ct. 2791 (recognizing States’ “legitimate interests in protecting prenatal life”); Roe v. Wade, 410 U.S. 113, 150, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (recognizing “the State’s interest— some phrase it in terms of duty—in protecting prenatal life”). Far from faithfully applying the Supreme Court’s abortion cases, this result contradicts them, along with a host of immigration and due-process cases the Court declines even to acknowledge. Garza v. Hargan today takes its place in the pantheon of abortion-excep-tionalism cases. Accordingly, I respectfully dissent. . A ■ recent declaration filed under seal by J.D.’s attorney ad litem provides further circumstantial evidence that J.D. left her home country because of her pregnancy. Cortez Decl. ¶ 8. . At oral argument, HHS stated its policy is that an emergency abortion, which it interprets to include a "medically necessary” abortion, would be allowed. Oral Arg. Recording 20:00-20:27. .Under insistent pressure to state whether the government was "waiving” the issue, counsel for the government said yes in the heat of the moment. Oral Arg. Recording 17:41-17:52. But the next moment, when reminded of the difference between forfeiture and waiver—a distinction that lawyers often overlook or misunderstand, cf. Kontrick v. Ryan, 540 U.S. 443, 458 n.13, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) (even "jurists often use the words interchangeably”)—counsel effectively retracted the foregoing statement, saying she was "not authorized to take a position” on whether J.D. has a constitutional right to an abortion, Oral Arg. Recording 17:52-18:51. . We cannot duck a broad constitutional question if the alternative ground is not "an adequate basis for decision.” Greater New Orleans Broad. Ass’n, 527 U.S. at 184, 119 S.Ct. 1923. At the panel stage; the possibility of expeditious sponsorship was an adequate narrower basis fqr our decision to briefly delay J.D.'s abortion. By contrast, today’s result— which has the real-world effect of entitling J.D, to an abortion—is difficult to explain unless it rests at least in part on the proposition that J.D. has a constitutional right to an abortion. Even if I were to assume, without in any way conceding, that J.D. had such a constitutional right, I would nonetheless stand by the panel order. . The panel dissent paid lip service to constitutional avoidance, Panel Dissent 8, before sweepingly declaring that when alien minors "find themselves on our shores and pregnant” and seeking an abortion, "the Constitution forbids the government from directly or effectively prohibiting their exercise of that right in the manner it has done here,” Panel Dissent 9-10 (emphases added). That is not judicial modesty. . I could not disagree more strongly with Judge Millett’s characterization of the government’s position on the merits—i.e., that it outright "waived” any contention that J.D. has no constitutional right to an abortion. Millett Concurrence 737 n.l. She must have read different papers and listened to a different argument from the ones I read and listened to. A waived argument "is one that a parly has knowingly and intelligently relinquished.” Wood v. Milyard, 566 U.S. 463, 132 S.Ct. 1826, 1832 n.4, 182 L.Ed.2d 733 (2012). The government has declared time and again that it is not taking a position on whether J.D. has a constitutional right to an abortion. That is not waiver. Government counsel in the district court stated that he was neither raising nor conceding the point. That is not waiver. Government counsel in this Court stated that she lacked authority to take a- position, That, too, is not waiver: counsel who disclaims such authority cannot relinquish an argument any more than she can advance one. All this is beside the point, however, because of our independent duty to declare the law. See U.S. Nat’l Bank of Or., 508 U.S. at 446, 113 S.Ct. 2173. . See also Albathani v. INS, 318 F.3d 365, 375 (1st Cir. 2003); Nwozuzu v. Holder, 726 F.3d 323, 330 n.6 (2d Cir. 2013) (discussing Kaplan); United States v. Vasilatos, 209 F.2d 195, 197 (3d Cir. 1954) (“in a literal and physical sense a person coming from abroad enters the United States whenever he reaches any land, water or air space within the territorial limits of this nation” but "those who have come from abroad directly to [an inspection] station seeking admission in regular course have not been viewed by the courts as accomplishing an 'entry' by crossing the national boundary in transit or even by arrival at a port so long as they are detained there pending formal disposition of their requests for admission”); United States v. Carpio-Leon, 701 F.3d 974, 981 (4th Cir. 2012) (“the crime of illegal entry inherently carries this additional aspect that leaves an illegal alien's status substantially unprotected by the Constitution in many respects”); Gonzalez v. Holder, 771 F.3d 238, 245 (5th Cir. 2014) (alien who entered the United States illegally at age seven and remained for the next 17 years was, under Kap-lan, deportable and ineligible for derivative citizenship despite his father’s intervening naturalization); Vitale v. INS, 463 F.2d 579, 582 (7th Cir. 1972) (paroled alien “did not effect an entry into the United States”); Montgomery v. Ffrench, 299 F.2d 730, 733 (8th Cir. 1962) (discussing Kaplan); United States v. Argueta-Rosales, 819 F.3d 1149, 1158 (9th Cir. 2016) (“for immigration purposes, 'entry' is a term of art requiring not only physical presence in the United States but also freedom from official restraint”); United States v. Canals-Jimenez, 943 F.2d 1284, 1286, 1288 (11th Cir. 1991) (reversing conviction of alien "found in” the United States illegally because alien never "entered” the United States in the sense of Kaplan and Leng May Ma). , Justice Kennedy's opinion in Din, because it is narrower than the plurality opinion, is controlling. See Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). . The panel dissent simply assumed that the Supreme Court’s abortion decisions involving U.S. citizen, women—from Roe v. Wade to Whole Woman's Health—apply mutatis mu-tandis to illegal alien minors. There is no legal analysis to support this assumption, see generally Panel Dissent 3-6, which is untenable for the reasons I have described. Judge Millett's subsequent opinion concurring in the Court’s en banc disposition does nothing to address that deficit, offering scarce authority to support its assertion of the thwarting of a “grave constitutional wrong” by the government and none that addresses the antecedent constitutional question, which the Court must decide but which Judge Millett dismisses as waived. Millett Concurrence 737 n.l, I cannot improve on the Chief Justice’s criticism of the "false premise” that our practice of avoiding unnecessary (and unnecessarily broad) ’ constitutional holdings somehow trumps our obligation faithfully to interpret the law. It should go without saying, however, that we cannot embrace a narrow ground of decision simply because it is narrow; it must also be right, Thus while it is true, that ”[i]f it is not necessary to decide more, it is necessary not to decide more,” sometimes it is necessary to decide more, There is a difference between judicial restraint and judicial abdication, When constitutional questions are "indispensably necessary” to resolving the case at hand, "the court must meet and decide them." Citizens United v. FEC, 558 U.S. 310, 375, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (Roberts, C.J., concurring) (quoting Ex parte Randolph, 20 F.Cas. 242, 254 (No. 11558) (CC Va. 1833) (Marshall, C.J.)). . My colleague’s characterization of this case, see, e.g,, Millett Concurrence 13, gives it an undeservedly melodramatic flavor—and indeed, from the record, especially the sealed affidavit of ORR’s Jonathan White, is contrary to fact. Sealed Supp. to Defs. Resp. to Pl.’s Pet. for Reh’g En Banc (Oct. 23, 2017). J.D. may be sympathetic. But even the sympathetic are bound by longstanding law. , J.D.’s "personhood" has nothing to do with it. "American citizens conscripted into the military service are thereby stripped of their Fifth Amendment rights and as members . of the military establishment are subject to its discipline, including military trials for offenses against aliens or Americans.” Eisentrager, 339 U.S. at 783, 70 S.Ct. 936. No one suggests that members of the military—or here, J.D.—are thereby not "persons,” . The panel dissent's handling of Zadvydas v. Davis also merits clarification. See Panel Dissent 9. Zadvydas is careful to distinguish "an alien who has effected an entry into the United States and one who has never entered" and restates Kaplan’s holding that "despite nine yéars' presence in the United States, an 'excluded' alien 'was still in theory of law at the boundary line and had gained no foothold in the United States’ ” only three sentences before observing, in the passage quoted by the panel dissent, that "once an alien enters the country/ the legal circumstance changes.” Zadvydas, 533 U.S. at 693, 121 S.Ct. 2491 (emphasis added). Zadvydas uses "entry” in its technical sense. . The majority’s decision rules against the Government "substantially for the reasons set forth in" the panel dissent. Given this ambiguity, the precedential value of this order for future cases will be debated. But for present purposes, we have no choice but to assume that the majority agrees with and adopts the main reasoning for the panel dissent. Otherwise, the majority would have no explanation for the extraordinary step it is taking today. For accuracy, I therefore use the word "majority” when describing the main points of the panel dissent. (If any members of the majority disagreed with any of the main points of the panel dissent, they were of course free to say as much.)